**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| E.F., et al., | Case No.: SACV 14-00455-CJC(RNBx) |
| Plaintiffs, | |
| v. | MEMORANDUM OF DECISION |
| NEWPORT MESA UNIFIED SCHOOL DISTRICT, et al., | |
| Defendants. | |

## I.  INTRODUCTION

Plaintiffs E.F., by and through his parents, Eric and Aneida Fulsang, and Eric and Aneida Fulsang ("Parents") (together with E.F., "Plaintiffs") appeal a decision issued by an Administrative Law Judge ("ALJ") in the Office of Administrative Hearings

("OAH"), OAH Case No. 2012050785 (the "OAH Decision").  On appeal, Plaintiffs argue that the ALJ erred in making various findings and therefore incorrectly concluded that Defendant Newport-Mesa Unified School District (the "District") properly assessed E.F.'s special educational program placement and offered him a free appropriate public education ("FAPE"), as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  (Dkt. No. 26 ["Pls.' Br."].)  For the following reasons, the Court AFFIRMS the OAH Decision.

## II.  BACKGROUND

### A.   Statutory Framework

The IDEA is a "comprehensive educational scheme, conferring on disabled students a substantive right to public education."  *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992).  The IDEA requires that all states receiving federal education funds provide disabled children a FAPE.  20 U.S.C. § 1412(a)(1)(A).  A FAPE must be "appropriately designed and implemented so as to convey" the handicapped child a "meaningful" benefit.  *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).  More specifically, a student's FAPE must be tailored to the unique needs of the child by means of an individualized educational program ("IEP").  20 U.S.C. § 1401(9); *see also Bd. of Educ. of Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982).  The IEP is a written statement prepared at an annual meeting between a qualified representative of a local educational agency, the student's teacher, the student's parents or guardian, and, when appropriate, the student.  This document contains, *inter alia*, an explanation of the child's present levels of performance and academic and functional goals, in addition to a statement of the specific and related educational services that the student will be provided.  20 U.S.C. § 1414(d)(1)(A)(i).  Following the issuance of an IEP, both a school district and a parent can request an administrative due process hearing before an ALJ to

receive a determination on whether the IEP had offered a student a FAPE as required by the IDEA.  *Id.* § 1415(f)(1)(A).

## B.  Factual Background

At the time the OAH Decision was issued in December 26, 2013, E.F. was a seven-year-old boy who resided within the jurisdictional boundaries of the Newport-Mesa Unified School District in California.  (Dkt. No. 13, Administrative R. ["AR"] at 491.)  E.F. is a child with autism and suffers from cognitive and communication delays.  The District placed E.F. in the special education program in February 2009.  (AR at 563.)

### 1.    2009–2010 School Year

E.F. was placed at the District's Harper Preschool for the 2009–2010 school year.  On February 9, 2010, the District held its second annual IEP meeting, which addressed various goals in areas such as academic readiness, speech and language ("SL"), occupational therapy ("OT"), and sensory processing.  (AR at 563–95.)  On April 15, 2010, an addendum to the February 2009 IEP was sent to the Parents.  (AR at 596–629.)  The addendum sought to delete one IEP goal, "sorting items by size," because E.F. had already met that goal.   (AR at 596.)   Subsequently, the Parents requested to discuss E.F.'s SL and OT needs, and the IEP team[1] reconvened on May 21, 2010.   (AR at 630, 1135–69.)   At the May IEP, the IEP team proposed changing one of E.F.'s 30-minute group SL sessions to two 15-minute individual sessions.  (AR at 1135.)  On June 21, 2010, the District presented a second addendum to the February IEP to inform the Parents that Harper Preschool was closing and as a result, E.F. was assigned to Mariner's Elementary School ("Mariner's").  (AR at 632.)  The parents had previously requested

---

[1]  The Court will refer to the individuals present at the IEP meetings at issue as the "IEP team."   While the Parents were present at all of the IEP meetings, the individuals present from the District varied.

that the District assign E.F. to Leah Steinman's class at Mariner's.  (AR at 631.)  The District granted the Parents' request, and E.F. began his second year of preschool at Mariner's in September 2010.

### 2.      2010–2011 School Year

#### i.      *November 2010 IEP*

Following E.F.'s transition to Mariner's, the IEP team held an addendum IEP meeting on November 23, 2010 to discuss E.F.'s progress.  (AR at 668–703.)  The IEP team noted that E.F. was progressing slower than he had been during the previous reporting period and that E.F. was significantly dependent on adults.  (AR at 668.)  To address E.F.'s limited progress, the IEP team identified several goals for modification. First, the IEP team modified E.F.'s calming strategy.  (AR at 677.)  Next, with respect to E.F.'s SL goals, the IEP team concluded that E.F. was not showing progress with his previously-set goals targeting the use of a Picture Exchange Communication System, or picture cards, and a sentence strip.  The IEP team therefore concluded that these goals be replaced with two foundational skills goals which consisted of using five communicative gestures and matching 2-D pictures with 3-D pictures, and the Parents consented to these modifications.  (AR at 668.)  Speech pathologist Dr. Kathleen Murphy was on the IEP team and found that, given E.F.'s inability to understand basic linguistic concepts at the time, E.F. was not ready to learn using an assistive technology ("AT") device.[2]  (AR at 2150–69.) Finally, in light of E.F.'s limited progress, the IEP team recommended, and the Parents agreed, that an early triennial assessment of E.F.'s education needs prior to E.F.'s next IEP meeting scheduled for February 2011 would be proper.  (AR at 668.)

---

[2]  Under IDEA, an AT device means "any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability. The term does not include a medical device that is surgically implanted, or the replacement of such device."  34 C.F.R. § 300.5.

### ii.    Triennial Assessment and February 2011 IEP

Pursuant to the November agreement between the District and the Parents, the District prepared a triennial assessment plan on December 6, 2010, and the Parents consented to the assessment plan as it was presented by the District on December 31, 2010.  (AR at 1179.)  In January 2011, the District conducted a seven-day triennial assessment. (AR at 704–51.)  E.F.'s cognition was assessed using two separate testing instruments.  (AR at 704–51.)  Under the first measure, E.F. received a standard score of 49, which is in a "very low range" of function, with visual and receptive language skills of a 5-month-old child, and fine motor skills ranging of a 26-month-old child.  (AR at 713–14.)  Under the second measure, E.F. received similar standard score of less than 50. (AR at 713–14.)

Subsequently, on February 4, 2011, the IEP team held their annual IEP meeting. Based on the triennial assessment results, the IEP team recommended that E.F. be found eligible for special education under the primary category of "Autistic-Like Behaviors," with secondary disabilities of "Intellectual Disability" and "Speech/Language Impairment."  (AR at 752.)  Next, after evaluating E.F.'s progress on the goals set the previous year, the IEP team found that E.F. fully met seven of the annual goals and had made substantial progress on the remaining nine.  (AR at 752–85.)  Ms. Steinman indicated that E.F. had increased his independence generally but was still struggling to consistently and independently use the restroom.  (AR at 783.)  Others on the team noted E.F.'s increased ability to communicate his non-preferred activities and that E.F. had been demonstrating better eye contact.  (AR at 783.)  The Parents noted that they themselves had witnessed E.F. making great progress, especially in his motor skills; however, the Parents did express concern regarding the slow rate of progress in E.F.'s communication skills as compared to his peers.  (AR 783–84.)  Based on the assessment of E.F.'s behaviors and progress, the IEP team developed and recommended 14 new

goals.  In a 34-page IEP, the team detailed E.F.'s unique educational needs in areas of, *inter alia*, his behavior, functional communication, social and emotional development, and visual motor coordination.  (AR at 752.)  Ultimately, the District offered continued placement in an intensive applied behavior analysis ("ABA")[3] special day class ("SDC"), group SL therapy once a week for 30 minutes, individual SL therapy twice a week for 15 minutes, OT consultation once a month, and participation in mainstream activities for eight and a half hours a week; the Parents consented.  (AR at 783–85.)

### iii.     April 2011 IEP

On April 19, 2011, the IEP team reconvened to plan E.F.'s transition to kindergarten at Eastbuff Elementary School ("Eastbuff").  (AR at 824–59.)  Present at the meeting were the Parents, Ms. Steinman, Dr. Murphy, Katherine Burns, who was a kindergarten special education teacher at Eastbuff , a school psychologist, a general education teacher, and an administrative representative from the District.  (AR at 859.)  At the meeting, Ms. Burns and Ms. Steinman discussed differences and similarities between their respective classrooms.  (AR at 824, 2335–36.)  The IEP team further discussed the amount of speech therapy that would be appropriate for E.F., given the less-structured nature of a kindergarten classroom.  (AR at 824–59.)  After much discussion, the IEP team made an offer of FAPE which included placement in Ms. Burns's classroom, which was an intensive ABA SDC for six and a half hours daily, group OT once a week, and a monthly OT consultation.  (AR at 824–25.)  The offer also included two weekly 15-minute individual SL services and increased E.F.'s group SL services to two weekly 15-minute sessions.  (AR at 824–25.)  The Parents expressed their discontent with the amount of individual SL services but ultimately consented to the transition IEP, and E.F. began attending Eastbuff in fall 2011.  (AR at 858–59.)

---

[3] ABA is an early intensive behavioral interaction service that helps children with autism to perform social, motor, verbal, behavior, and reasoning functions that they would not otherwise be able to do.

### 3.        2011–2012 School Year

#### i.        February 2012 IEP

The IEP team reconvened on February 29, 2012 for E.F.'s annual IEP meeting. (AR 864–96.)  The team reviewed E.F.'s progress since the February 2011 IEP meeting and indicated that E.F. had fully met 11 of his 14 goals and made substantial progress on the remaining three.  (AR at 894.)  The Parents discussed that E.F. had begun using an iPad at home and requested that the District teach E.F. how to read and write through the use of an iPad. (AR at 894.)  At this point, however, the District did not proceed to assess E.F. in the area of AT nor did it discuss whether E.F.'s progress with an iPad indicated that E.F. could benefit from using an iPad to develop more functional means of communication.  The IEP did not refer to E.F.'s developments with his iPad or suggest any other electronic device that would help E.F.'s ability to communicate.   Dr. Murphy agreed that an iPad is one method by which to implement the IEP team's proposed "face discrimination" goal, but the team did not believe that an AT device would be beneficial, as E.F. was still working on the foundational skills of understanding symbolic communication, visual scanning, and visual discrimination.  (AR at 2231–33, 2236–38.) The Parents did not request an AT assessment at this time.  (AR  at 2238.)

The IEP team did, however, develop 16 new goals, including the areas of school readiness, self-help, functional expressive and receptive communication, mathematics, and language arts.  (AR at 864.)  Next, the IEP team made its offer of FAPE, which included E.F.'s continued placement in an intensive ABA SDC kindergarten for six and a half hours daily and group OT once a week.  (AR at 864.)  The team proposed that E.F.'s SL therapy sessions remain the same as he was reaching his goals when provided this level of service.  The Parents consented to this IEP in its entirety.  (AR at 896.)

## ii.        *Request for One-on-One Aide*

Although not mentioned at the February IEP meeting, E.F. had been accidently injured in an incident on February 1, 2012 prior to the IEP.  E.F. had walked into the path of another child on a swing while the adult supervising E.F. briefly turned away from him.  Following the accident, the Parents and the school staff met to discuss the incident, and the staff held several separate meetings to discuss strategies to keep E.F. safe on the playground.  (AR at 1405–06, 2398–99.)  Ultimately, E.F. was assigned an adult to specifically monitor E.F. on the playground.  In a brief letter dated April 5, 2012, the Parents requested that E.F. be provided a one-on-one aid.  (AR at 897.)  The District declined the Parents' request through a prior written notice on April 17, 2012.  (AR at 898–902.)  The letter detailed reasons why the District believed an aide was not necessary to address E.F.'s needs.  (AR at 898–902.)  The District reasoned that E.F. had already met most of his prior goals and was making progress on the rest.  The letter further noted that given E.F.'s placement, there already was a low staff to student ratio—one adult for every two children at the time—which provided E.F. with FAPE and allowed him to make educational progress.  (AR at 898–902.)  Nevertheless, Plaintiffs requested a due process hearing and filed their original complaint before OAH on May 17, 2012.   (AR at 1.)

## 4.      **2012–2013 School Year**

## i.        *Private AT Assessment*

In July 2012, the Parents decided to independently obtain a private AT assessment report from Cindy Cottier, an augmentative communication specialist.  (AR at 903–07.) In a report dated July 18, 2012, Ms. Cottier noted her recommendations and her observations after a 90 minute evaluation of E.F.  (AR at 903.)   The District learned of

the Parents' decision to obtain the evaluation when they later received the report.  (AR at 1943.)

### ii.    Interim Agreement

On November 29, 2012, the parties entered into an interim settlement agreement in which the District agreed to fund an independent education evaluation ("IEE") of E.F. to be conducted by Dr. Lauren Franke.  (AR at 908–09.)  The parties agreed that Dr. Franke would review E.F.'s records and make a recommendation on whether additional data or assessments would be necessary.  (*Id.*)

### iii.    January 2013 IEP

The IEP team convened on January 23, 2013 to develop E.F.'s annual IEP.  (AR at 920–57.)  Dr. Franke attended the IEP meeting, and the IEP team first discussed the results from the IEE and her recommendations.  (AR at 920–57.)  Based on her review, Dr. Franke opined that the District should have conducted a functional analysis assessment of E.F. and that use of AT was appropriate for E.F.  (AR at 952.)  Next, Ms. Lila Seldin, one of the District's AT specialists, reviewed her assessment with the IEP team.  (AR at 952.)  Ms. Seldin had evaluated several devices and had worked with E.F. to determine which device would best fit his needs.  (AR at 910–19, 952.)  Ms. Seldin recommended that E.F. use an iPod Touch with "Proloquo2Go" software and speech generation capabilities.  (AR at 914.)

Finally, the IEP team reviewed E.F.'s progress on his goals and indicated that he had fully met 10 of his goals and had made progress on the remaining six.  (AR at 920.)  The IEP team then discussed E.F.'s current needs and progress and developed 15 new goals for the following year in the areas of behavior, social emotional development,

speech and language, fine motor skills, mathematics, and language arts.  The IEP team made its FAPE offer which included E.F.'s continued placement in an intensive ABA SDC, individual 30-minute SL therapy once a week, small group 30-minute SL therapy once a week, individual consultation once a week, and group OT once a week.  (AR at 920–57.)   In addition, the IEP team discussed and offered an intensive training regimen for a trial implementation of an iPod Touch for E.F.'s use.  (AR at 1235–36.)  The trial period was to be implemented for the first two months of the annual period and included individual SL therapy three times a week and AT consultation once a week.  Ms. Seldin provided training on the iPod Touch to the school staff and the Parents.  (AR at 1235.)

Finally, in light of the Parents' requests, the IEP team agreed to focus on E.F.'s sensory diet[4] and conduct a functional behavior assessment ("FBA") and an Independence Facilitator ("IF") assessment to assess whether a one-on-one aide was necessary for E.F. to continue progressing.  Based the meeting discussions, the IEP team concluded that the FBA should focus on three behaviors E.F. exhibited at school.  (AR at 1519–20.)

### iv.    May 2013 IEP

On May 2, 2013, the IEP team met to discuss the results of the FBA and IF assessment.  (AR at 1190–1231, 961–71.)  Dr. Eliza DelPizzo, the District's autism specialist, assessed the FBA and determined that none of the three targeted behaviors occurred at such a level to be disruptive to learning.  (AR at 961, 1190.)  A No Behavior Support Plan was recommended for E.F. because E.F.'s low level of behaviors was observed to be appropriately managed by his classroom's ABA-based behavior management structure.  (AR at 1506, 1523–24, 1556–59.)  The FBA was based on a

---

[4] "A sensory diet is a way of facilitating self-regulation skills using sensory activities incorporated into the child's daily activities."  (AR at 1307.)

teacher interview, descriptive assessment tools, and direct observation, and the FBA contained all of its required elements—identification of target behaviors, data collection, hypothesis of function of the behaviors, and recommendations.  (AR at 961–71, 2633–34.)

The IEP team also discussed the District's proposed sensory diet.  (AR at 1191.) To further support implementing a sensory diet in the classroom, the IEP team recommended additional services of OT consultation once a month.  (AR at 1191.)  In addition to E.F.'s sensory diet, the IEP team discussed the IF assessment report.  The evaluation was conducted by observing E.F. six times over a period of three weeks in various educational settings, such as group instruction, recess, and physical education.  It was noted that E.F. was making progress on his IEP and that additional adult monitoring was not necessary.  (AR at 1191.)  Finally, the IEP team discussed the trial of E.F.'s use of an iPod Touch.  At that point, all the staff members working with E.F. had completed their training sessions for the device, (AR at 1192), and E.F. had been using an iPod Touch for about three months and was able to use the device to label "bathroom" and to make functional requests, rejections, cessations, and recurrence.  (AR at 1191–92.)  The IEP team agreed to continue AT consultation services once a month.

### v.    *Institute for Applied Behavior Analysis*

Notwithstanding the previous FBA conducted by the District, the Parents obtained a private FBA from the Institute for Applied Behavior Analysis ("IABA") in mid-2013 and provided the District the results in September 2013.  (AR at 1042.)  The IABA's FBA targeted "inconsistent responding behaviors" and was mostly based on video observations of E.F. at home and 2 hours of observation in E.F.'s behaviors in a school setting.  The team of eight that created the IABA report included Dr. Elizabeth Hughes.  (AR at 1042.)

### 5.    OAH Decision

Plaintiffs due process request was ultimately heard over a seven-day hearing before the ALJ in October 2013.  After receiving approximately 50 documents into evidence and hearing testimony from 16 witnesses, including Ms. Burns, Ms. Seldin, Dr. Murphy, Dr. Hughes, and the Parents, the ALJ issued the OAH Decision on December 26, 2013.  (*See* AR at 1271–1331.)   The ALJ found that Plaintiffs had failed to meet their burden of proof that the goals set by the District, E.F.'s placement, and most services in E.F.'s IEPs were legally inadequate.  (AR at 1274.)  The ALJ further found that Plaintiffs failed to demonstrate that the District's assessments were improper or that the District staff was not properly trained to provide E.F. with instruction or services.  (*Id.*)  Finally, although the ALJ did find that the District did not fail to appropriately assess or address E.F.'s needs in the area of functional behavior, the ALJ found that the District should have assessed E.F. in the area of AT earlier than spring 2013 and should have provided E.F. with an electronic AT device and assistive technology services approximately a year before it first did.  (*Id.*)  Accordingly, the ALJ awarded E.F. 20 sessions of 20-minute individual, AT services to assist him with using the iPod Touch for the purposes of functional communication, but denied all other relief sought by Plaintiffs.  (AR at 1331.)  In March 2014, Plaintiffs appealed the OAH Decision to this Court under 20 U.S.C. § 1415(i)(3)(A).  (Dkt. No. 1 ["Compl."].)[5]

//

//

//

---

[5]   In their Complaint, Plaintiffs assert claims relating to the District's failure to provide highly qualified staff (Compl. ¶ 189), the ALJ's finding that E.F. "partially" prevailed on a "small portion" of Issues 1 and 2 (Compl.¶ 192), the ALJ's refusal to admit rebuttal evidence (Compl. ¶ 193), and the ALJ's grant of the District's motion to strike a portion of Plaintiffs' closing brief (Compl. ¶ 194).  However, Plaintiffs have waived these claims as they failed to address them in their opening brief.  *See Iob v. L.A. Brewing Co.*,183 F.2d 398, 401 (9th Cir. 1950).

## III.  STANDARD OF REVIEW

Any party aggrieved by a decision from a due process request under the IDEA may appeal the findings and decision to a federal district court.  20 U.S.C. § 1415(i)(2).  The party challenging the administrative decision has the burden of proving deficiencies in the administrative decision and the burden of demonstrating that the ALJ's decision should be reversed.  *See Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996); *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

When evaluating an appeal of an administrative decision under the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The courts review an ALJ's findings of fact for clear error.  *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001).  A finding of fact is clearly erroneous if " 'the reviewing court is left with a definite and firm conviction that a mistake has been committed.' "  *Id.* (quoting *Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983)).  Mixed questions of fact and law are reviewed *de novo* unless the question is primarily factual. *Id.*  A district court reviews the ALJ's conclusions *de novo*.  *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 949 (9th Cir. 2010).

In IDEA cases, courts give less deference to an administrative decision than in other administrative cases, but the amount of deference is in the discretion of the court. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993).  The court must "consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.  After consideration, the court is free to accept or reject the findings in part or in whole."  *Id.* at 1474 (internal quotation marks and citations

omitted).  Nevertheless, courts must give "due weight" to the judgments concerning educational policy and not " 'substitute their own notions of sound educational policy for those of the school authorities which they review.' "  *Van Duyn*, 502 F.3d at 817 (quoting *Rowley*, 458 U.S. at 206).  Ultimately, when exercising discretion to determine what weight to give the ALJ, courts give deference when the ALJ's decision "evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented." *Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996); *Ojai*, 4 F.3d at 1476; *see also Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891–92 (9th Cir. 1995) (finding that "[t]he hearing officer's report was especially careful and thorough, so the judge appropriately exercised her discretion to give it quite substantial deference").  A court must also be particularly deferential to the ALJ's findings when they are based on credibility determinations of live witness testimony.  *See Amanda J.*, 267 F.3d at 887–89. Here, the record before the Court reflects that the ALJ presided over a seven-day hearing, during which a total of 16 witnesses, including experts, testified.  The 61-page OAH Decision contains 185 very thorough factual findings and provides complete, well-reasoned, and thoughtful evaluations of each party's contentions.  Therefore, the Court affords substantial deference to the OAH Decision.

**IV. ANALYSIS**

### 1.    The ALJ's Factual Findings

As a preliminary matter, Plaintiffs contend that the ALJ's decision should be accorded no deference due to errors in her factual findings.  (Pls.' Br. at 14 ["The Decision has several findings of fact that appear to be in clear error.  As such, the deference normally given to the ALJ's determinations should not apply."].)   First, Plaintiffs assert that the ALJ erred in her statement that "[t]he terms 'augmentative

communication' and 'assistive technology' were used interchangeably by the parties."
(*See* AR at 1274.)  The ALJ's notation on this technicality did not constitute clear error.
Indeed, the parties did use the terms interchangeably.  (*See, e.g.*, AR at 903, 905, 910,
952, 953, 1449, 1638.)  As used by the parties, the terms "augmentative communication"
("AC"), also referred to as "augmentative and alterative communication"  ("AAC"), and
AT are indistinguishable for the purposes of this case.  The gravamen of the parties'
disagreement had always been the District's decision to provide and train E.F. to use an
iPod Touch—which was an electronic device he used for communication purposes.
Plaintiffs themselves define AC/AAC as a form of communication using augmentative
aids "such as picture and symbol communication boards and *electronic devices.*"  (Pls.'
Br. at 15.)  And as noted above, under IDEA, an AT device is "any item, piece of
equipment, or product system, whether acquired commercially off the shelf, modified, or
customized, that is used to increase, maintain, or improve the functional capabilities of a
child with a disability."  34 C.F.R. § 300.5.

Next, Plaintiffs take issue with the ALJ's finding that E.F. "has been diagnosed
with an intellectual disability."  (AR at 1275.)  To the extent Plaintiffs are challenging the
ALJ's finding that E.F. was eligible under the category of intellectual disability, the
evidence before the Court simply does not demonstrate that the ALJ clearly erred.  The
District had presented testimony by a psychologist that performed a thorough assessment
of E.F.'s cognitive and adaptive behavior function in 2011 and found that E.F. had an
intellectual disability, and these results were corroborated by previous testing and by
E.F.'s private ABA agency.  (AR at 712, 752, 2554, 2559–65.)  Plaintiffs point to no
evidence otherwise.

Plaintiffs also contest the ALJ's finding that E.F. "has consistently received at least
10 hours of ABA services a week." (AR at 1275.)  As testimony before the ALJ did
indicate that E.F. received 10 hours of direct in-home ABA therapy services at some

point, (AR at 705), the Court cannot conclude that the ALJ's finding was clearly erroneous.  Furthermore, Plaintiffs argue the ALJ clearly erred in finding that the "District conducted an FBA at Parents' request."  (AR at 1307.)   Plaintiffs' argument again contradicts the evidence.  While Dr. Franke did recommend that a FBA be conducted, the evidence also conclusively shows that the Parents and their attorney wanted to have the FBA conducted.  (AR at 953, 2632–36.)  Finally, Plaintiffs disagree with the ALJ's finding that "Parents' main concern was, and consistently has been, that [E.F.] learn to speak."  (AR at 1277.)  Again, the Court declines to find that the ALJ clearly erred on such a finding.  The evidentiary record is replete with the Parents' various concerns regarding the amount of speech therapy the District provided and the progress E.F. made.  This finding is not narrowly construed to read that E.F. learning to speak was the Parents' "main" concern, especially in light of the rest of the OAH Decision where the ALJ acknowledged and addressed the remainder of the Parents' concerns.

Plaintiffs do not indicate how any of these purported errors materially affected the ALJ's conclusions or how they were significant factors in the ALJ's assessment of the District's conduct.  The Court does not find that the ALJ committed clear error and that her decision should not be afforded substantial weight.

## 2.    E.F.'s IEP

Under the IDEA, a child's IEP must be "reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at 207.  More specifically, "[e]ach IEP must include an assessment of the child's current educational performance, must articulate measureable educational goals, and must specify the nature of the special services that the school will provide."  *M.M. v. Lafayette Sch. Dist.*, CV 09-4624, 2012 WL 398773, at * 5 (N.D. Cal. Feb 7, 2012).  "If these requirements are met, the State has

complied with the obligations imposed by Congress and the courts can require no more." *Id.* Here, Plaintiffs contest the ALJ's finding that Plaintiffs failed to meet their burden of proof that the District failed to provide E.F. with a FAPE since May 16, 2010.[6] Specifically, Plaintiffs contend that the District did not provide E.F. with a FAPE because it failed to adopt appropriate goals for E.F., and failed to provide appropriate placement and services in the areas of behavioral support, speech therapy, occupational therapy, assistive technology, and parental training.  (AR at 1320.)

### i.     *Annual Goals*

First, Plaintiffs assert that they had met their burden of proof that the goals the District had developed at every IEP in question denied E.F. a FAPE.  An annual IEP is a statement of measurable annual goals designed to: (1) meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general curriculum, and (2) meet each of the pupil's other educational needs that result from the individual's disability.  *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 444 (9th Cir. 2010).  The IEP must be designed to meet the students unique needs and must be reasonably calculated to enable the child to receive an educational benefit.  *Rowley*, 458 U.S. at 206–07.  However, as long as the child is benefiting from his education, it is up to the educators to determine the appropriate methodology.  *Id.* at 208.  Here, Plaintiffs have not demonstrated, by a preponderance of the evidence, that the District's goals were inadequate.  Contrary to Plaintiffs' assertions, the fact that E.F. did not meet all of his goals set in each IEP does not signify that the

---

[6]   The ALJ properly concluded that the February 2010 IEP, as amended by the April 2010 IEP, was outside the applicable two-year statute of limitations period and the IDEA does not recognize a "continuing violation" exception to the statute of limitations.  *See* 20 U.S.C §§ 1415(b)(6)(B), (f)(3)(D); *see also J.L. v. Ambridge Area Sch. Dist.*, 622 F. Supp. 2d 257, 268–69 (W.D. Pa. 2008) (finding that IDEA claims are not tolled under a continuing violation theory as the two exceptions specifically set forth in the statute are the exclusive exceptions to the statute of limitations).

goals were improper under the IDEA.  *See Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987) (holding that "an appropriate public education does not mean the absolutely best of potential-maximizing education for the individual child"). Furthermore, the evidence before the Court indicates that the IEP team carefully assessed E.F.'s progress at every IEP meeting at issue.  After assessing the goals E.F. met or was still progressing on, the IEP team would develop new goals to address E.F.'s various areas of need at the time.  To support their argument otherwise, Plaintiffs hang their hat on Dr. Hughes's testimony and contend that the ALJ failed to acknowledge her testimony on the issue.  (Pls.' Br. at 39.)   After reviewing the record, the Court concludes that the testimony Dr. Hughes provided does not sufficiently establish that the goals were deficient—her testimony was premised on faulty comparisons to irrelevant reports.  (AR at 1769–76.)[7]

## ii.    *Behavioral Support & Services*

In their briefing, Plaintiffs make vague and conclusory statements to argue that E.F. was denied appropriate placement and services in the areas of behavioral support. Without any concrete argument or citation to the record, the Court cannot ascertain Plaintiffs' contentions on this issue.  *See Seattle Sch. Dist.*, 82 F.3d at 1498 (finding that the party challenging the administrative decision has the burden of proving its deficiencies).  Therefore, the Court gives deference to the ALJ's thorough analysis and

---

[7]  Plaintiffs seem to take issue with the ALJ's credibility determination of Dr. Hughes and the weight she gave to her IABA report.  According to Plaintiffs, the ALJ did not accord sufficient importance to the report and the fact that a team of eight people created it.  The ALJ heard live testimony from Dr. Hughes, independently reviewed the report, and concluded that there were many flaws.  (AR at 1310.) As the finder of fact, the ALJ is in the best position to assess witness credibility and make the appropriate determination to reach her conclusion.  *See Amanda J.*, 267 F.3d at 889.  Thus, to the extent Plaintiffs are requesting this Court to afford less deference to the ALJ on this ground, the Court declines to do so and affirms the ALJ's evaluation.

conclusion on this issue and finds that the District did not deny E.F. a FAPE with regard to the behavioral support and services.

### iii.   *Speech Therapy*

Next, Plaintiffs contend that the District did not provide E.F. a sufficient amount of speech therapy.  Plaintiffs argue that to make progress in his ability to communicate, E.F. required at least three hours a week of direct services.  Nothing in the record, however, supports Plaintiffs' argument.  First, Plaintiffs cite to an "Augmentative Communication Evaluation Report" prepared by Ms. Cottier for their proposition that she recommended that E.F. required three hours of therapy a week.  (Pls.' Br. at 32–33.)  The report, however, recommends three to four sessions of individual speech therapy a week for 20 to 30 minutes a session, totaling to two hours a week at most.  (AR at 907.)  Next, Plaintiffs' reliance on Dr. Hughes's testimony on this issue is also misplaced.  Dr. Hughes is not a speech and language pathologist nor did she or anyone at her agency ever conduct a speech and language assessment of E.F.  To the extent that the IABA report prepared by Dr. Hughes's team addressed speech therapy, it simply recommended that E.F. should be evaluated for individual speech therapy sessions.  (AR at 1086.)  Finally, Mr. Fulsang's testimony that the Parents had gotten third-party recommendations that E.F. should be receiving around three hours a week of individual speech therapy is unpersuasive.  (AR at 1399–1400.)  Plaintiffs did not, and still have not, identified a specific speech and language pathologist who actually made such a recommendation. (AR at 1399–1400.)  Thus, Plaintiffs have not met their burden of proof that the District failed to meet E.F.'s need in the area of speech therapy.

//
//
//

### iv.    Occupational Therapy

Plaintiffs also assert that the District failed to meet E.F.'s fine motor and sensory needs.  Plaintiffs, however, again fail to demonstrate that the District failed in providing E.F. a FAPE in this regard.  The evidence before the Court shows that E.F.'s sensory needs were being adequately addressed and documented in his IEPs.  (AR at 640, 654, 691, 775, 813, 849, 890, 904.)  The only evidence Plaintiffs point to in support of their claim is Ms. Cottier's recommendations in her Augmentative Communication Evaluation Report.  The Court accords deference to the ALJ's evaluation of Ms. Cottier on this issue, *Amanda J.,* 267 F.3d at 889 ("[C]redibility-based findings . . . deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion."), and finds that Ms. Cottier's recommendation should be given little weight as she does not have specific training or expertise in OT and was not questioned about E.F.'s OT goals during her testimony.   In fact, the only reference regarding E.F.'s sensory needs in Ms. Cottier's report is a note that Mr. Fulsang informed her that E.F. *was* receiving a sensory diet.  (AR at 904, 1882–83.)  Plaintiffs therefore failed to meet their burden on this issue as well.

### v.    Assistive Technology

The ALJ concluded that Plaintiffs met their burden in showing that the District denied E.F. a FAPE by failing to conduct an AT assessment earlier than February 2013 and by failing to provide him with an electronic AT device and corresponding speech services a year earlier.  In an attempt to cast doubt on the ALJ's favorable ruling, Plaintiffs now contend that the ALJ erred in finding that the denial of a FAPE was limited to only that one year, 2012–2013, rather than the entire three-year period the ALJ was evaluating.   The ALJ, however, did not err in limiting her finding to a specific period of time.  Her decision was reasonable as the District first learned of E.F.'s success using an

iPad at the February 2012 IEP.  The District did not act to have E.F. assessed until November 2012 and did not provide E.F. with any AT device or service until the January 2013 IEP meeting, almost a year after the previous IEP meeting.   Prior to learning about E.F.'s success with an iPad in February 2012, however, the District was reasonable to believe that E.F. was not yet ready to start using "high-tech" devices, as his knowledge regarding such communication was still emerging.

### vi.    Parent Training & Collaboration with In-Home Providers

Plaintiffs argue that the District failed to provide the Parents and E.F.'s in-home providers with appropriate training.   On appeal, Plaintiffs again fail to point to any evidence to support their argument and in a conclusory manner simply state "[a]though much mention was made of the need to collaborate with home and service providers, no effort was made to accomplish such," (Pls.' Br. at 40).   *See Seattle Sch. Dist.*, 82 F.3d at 1498.  Nevertheless, the Court finds that the evidence in the administrative record shows that the District did in fact coordinate and collaborate with the Parents and E.F.'s in-home providers.  (AR at 1458, 1517, 2313.)  Accordingly, there was no denial of a FAPE due to insufficient parent training or collaboration.

### 3.    The District's May 2013 Functional Behavioral Assessment

Plaintiffs argue that the District's FBA assessment was flawed because it did not identify the behaviors that were impeding E.F.'s potential educational progress.  On appeal, Plaintiffs contest the ALJ's finding that the District's 2013 FBA was appropriate and that there was no need to conduct the FBA earlier.  In reaching her conclusion, the ALJ heard testimony from E.F.'s teachers, Ms. Daniela Angela Manea, Ms. Steinman, and Ms. Burns, all of whom testified that none of E.F.'s behaviors were interfering with

his learning abilities.[8]  Plaintiffs criticize the ALJ's determination that Dr. Hughes's testimony to the contrary was unpersuasive, but do not point to anything to undermine the ALJ's credibility determination.  *See K.S. ex rel. P.S. v. Fremont Unified Sch. Dist.*, 545 F. Supp. 2d 995, 1003 (N.D. Cal. 2008) ("A district court should accept the ALJ's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.' ").  Dr. Hughes testified that E.F.'s behaviors were impeding his progress and that the District did not focus on the behaviors that were actually affecting E.F., such as "inconsistent responding behaviors."  The ALJ provided several sound reasons why she found Dr. Hughes's testimony unpersuasive on this issue.  (AR at 1315–16.)  First, there was no evidence that Dr. Franke, "the impetus behind the District's decision to conduct its FBA," believed the behaviors were ultimately targeted for the FBA were inappropriate.  Next, the ALJ found Dr. Hughes's testimony unpersuasive because the behaviors she described were attributed to E.F.'s inattention, which was already being addressed in E.F.'s classroom and IEP goals.  Finally, the ALJ found that Dr. Hughes's testimony that E.F. never received proper ABA therapy and required more intensive ABA services was not persuasive in light of all the evidence.  E.F.'s teachers all testified that they received intense ABA training to work with autistic children, and the proposition that E.F. failed to receive adequate ABA intervention is contrary to all the evidence proving that the District and other private agencies had provided ABA services to E.F. for the past 5 years.  In light of the evidence, the Court concludes that the ALJ did not err in weighing the respective testimonies.  The Court finds that Plaintiffs have failed to prove that the District's FBA was inappropriate and untimely.

//

---

[8]  All three teachers taught autism-specific classes and used ABA methodology.  Ms. Burns was part of the team that conducted the District's FBA following Dr. Franke's recommendation that one be conducted.

### 4.      Remedy Awarded to Plaintiffs

Lastly, Plaintiffs appeal the ALJ's award of compensatory remedies.  The IDEA confers broad discretion on courts to grant equitable relief they determine is appropriate. *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 360 (1985). "Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA."  *Park, ex el. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006) (internal quotation marks and citation omitted). First, as discussed above, the District denied E.F. a FAPE from February 2012 to January 2013—approximately one year—by failing to provide E.F. AT to communicate functionally and progress in his speech goals.  Thus, the appropriate remedy would be compensation for this time period.  The ALJ awarded Plaintiffs 20 additional sessions of AT therapy sessions to specifically address E.F.'s functional communication needs.  (AR at 1330.)  Twenty additional sessions of individual therapy, even in light of Ms. Cottier's recommendation of three to four sessions a week, was equitable given the sessions already provided in E.F.'s IEPs.  *See Park*, 464 F.3d at 1033 ("[T]here is no obligation to provide a day-for-day compensation for time missed.").

Plaintiffs also argue that they should have been reimbursed for Ms. Cottier's assessment report.   A "parent has the right to an independent educational evaluation at public expense *if the parent disagrees* with an evaluation obtained by the public agency." 34 CFR § 300.502(b)(1) (emphasis added).  The record before the Court, however, shows that the Parents independently obtained a private AT assessment from Ms. Cottier without the District's knowledge and prior to the one the District ultimately conducted on its own.  Plaintiffs are therefore not entitled to this compensation as their decision to obtain Ms. Cottier's assessment was not a result of any disagreement with an evaluation conducted by the District.

**V.  CONCLUSION**

Accordingly, the Court AFFIRMS the OAH Decision.

DATED:      June 22, 2015

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE