1              **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

3         **HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

4
    E.F., et al.,                      )
5                                       )
                     Plaintiffs,        )
6                                       )
          vs.                           )    Case No.
7                                       )    8:14-cv-00455-CJC-RNB
    NEWPORT MESA UNIFIED SCHOOL         )
8   DISTRICT, et al.,                   )
                                        )
9                    Defendants.        )
    _____)
10

11

12

13                    REPORTER'S TRANSCRIPT OF
                         MOTION HEARING
14                    MONDAY, JUNE 22, 2015
                           9:02 A.M.
15                    SANTA ANA, CALIFORNIA

16

17

18

19

20

21

22   _____

23              **DEBBIE HINO–SPAAN, CSR 7953, CRR**
             FEDERAL OFFICIAL COURT REPORTER
24          411 WEST FOURTH STREET, ROOM 1-191
            SANTA ANA, CALIFORNIA 92701-4516
25              dhinospaan@yahoo.com


                    **UNITED STATES DISTRICT COURT**

1        **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFFS:**

4           LAW OFFICES OF KATHLEEN M. LOYER, INC.
            BY:  KATHLEEN M. LOYER, ATTORNEY AT LAW
5           940 Calle Amanecer
            Suite L
6           San Clemente, California 92673
            (949) 369-1082
7
    **FOR THE DEFENDANTS:**
8
            HARBOTTLE LAW GROUP
9           BY:  S. DANIEL HARBOTTLE, ESQ.
            18401 Von Karman
10          Suite 200
            Irvine, California 92612
11          (949) 428-8780

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **SANTA ANA, CALIFORNIA; MONDAY, JUNE 22, 2015**

2                       **9:02 A.M.**

3                        **- - -**

4          THE COURTROOM DEPUTY:  Calling Item No. 1,

09:02AM  5   SACV-14-455, E.F., et al. versus Newport Mesa Unified School

6    District, et al.

7        Counsel, please state your appearances.

8          MS. LOYER:  Kathleen Loyer, spelled L-o-y-e-r,

9    appearing for the plaintiffs.

09:03AM 10          THE COURT:  Hello, Ms. Loyer.

11          MS. LOYER:  Good morning.  And this is my intern

12   clerk for the summer, Phillip Kunka, spelled K-u-n-k-a.  I'm

13   sorry.  I just wanted to let you know who's here, Your Honor.

14          MR. KUNKA:  Thank you.

09:03AM 15          THE COURT:  I appreciate that.

16        You're welcome, sir.

17          MR. HARBOTTLE:  Good morning, Your Honor.  Dan

18   Harbottle, H-a-r-b-o-t-t-l-e, for Newport Mesa School District.

19          THE COURT:  Hello, Mr. Harbottle.

09:03AM 20          MR. HARBOTTLE:  Good morning.

21          THE COURT:  Well, I've received all the position

22   papers and the ALJ's decision, and I have a -- I guess a

23   general softball question for you, Ms. Loyer.  Tell me, what do

24   you think is the most efficient aspect of the placement and

09:03AM 25   education that the district provided to E.F.?

1      MS. LOYER:  Well, Your Honor, I think it's the lack

2  of understanding, his need for functional communication.  And

3  as I detailed in my brief, I -- do you want me to stand,

4  Your Honor?  I'm sorry.

09:04AM 5      THE COURT:  Thank you.  It probably would be easier

6  for you so you're not bending your back.  Why don't you go to

7  the lectern, and so it's easier for Debbie, our court reporter.

8  It's a beautiful courtroom, at least I think it's a beautiful

9  courtroom, but listen, can you hear me when I'm over here?  So

09:04AM 10  you can imagine that's why we have to speak into the

11  microphone.

12      MS. LOYER:  Okay.  That is better.  Thank you,

13  Your Honor.

14     I think it's -- the foundational thing to teach children

09:04AM 15  is communication.  And we tried to lay it out in our briefs and

16  responses that this seemed to not quite resonate with the ALJ

17  who heard the case.  I think the factor -- his cognitive

18  ability question played into that.  I think that there was

19  evidence in the record and in the testimony that only partial

09:05AM 20  scores could be achieved because of the lack of communication

21  and his ability to participate in the -- the protocols that are

22  administered.  And so those two things to me are the main point

23  of this case.

24     And it appears that they were minimized by the ALJ.  And

09:05AM 25  we have these pages and pages, but even in finding that the

        district was remiss for one year, I just feel that given the
        presentation of everybody involved, she missed the point by
        minimizing it.

              And so if we look at it from that point of view, the best
09:05AM   analogy I think I can give the Court, if you ever saw the movie
        *"The Miracle Worker"* about Helen Keller, there's that one scene
        where they're at the pump and she puts together the word
        "water," "wa" with "water," and that's what opened her door.
        And look what they found when they opened the door.  E.F.
09:06AM   hasn't been given that opportunity up until that point.

              And the testing they're relying on is not reliable by
        their own statements that they were incomplete and unreliable.
        And it appears that they kind of latched onto that because that
        was an easy way to explain why he wasn't progressing.

09:06AM         THE COURT:  Tell me what you think, Ms. Loyer, they
        should have done in terms of functional communication.  What
        specifically should have been done that wasn't?

              MS. LOYER:  I think that when he failed to
        progress -- let's just stop for a minute and give you some
09:06AM   foundation on that.  One of the things that came up in the
        hearing, but not necessarily before the hearing, was his lack
        of readiness skills.  And I think if you really read the
        documents presented at the underlying administrative hearing as
        well as the arguments we presented, they demonstrated that he
09:07AM   met goals that spoke just to that -- the eye contact, some

minimal verbal behavior -- but they didn't take the next step,

and that's where the AT comes in.

    If we were back in 1980, it would be a different case, but

we were in an age back then, even before I was involved with

09:07AM the family and their case, assistive communication devices were

there.  As a matter of fact, when we finally got to that with

the district, they had one in stock, which is why we switched

to the iTouch, because they said they could have that

immediately, where it would take six weeks to order what was

09:07AM recommended.

    And so it wasn't a lack of knowledge on the district's

part about this type of technology, it was their lack of giving

it a try with him.  PECS wasn't working by their own testimony.

Signing wasn't working.  And so we have very limited choices.

09:08AM He's a very complicated autism case.  He's complex.  He had

fine motor issues as well as communication issues.  And so that

makes certain things harder.

    And the degree of his -- this communication disability was

pretty severe.  And we're not trying to minimize that, but the

09:08AM key to this child was AT.  And as I noted in my pleading, his

father testified that when they went out and bought it and gave

it to him, he took to it like a duck to water.

    And so the analogy, going back to the Helen Keller

analogy, I'm not saying that he's going to start speaking

09:08AM tomorrow, because he has an assistive technology device, but he

**UNITED STATES DISTRICT COURT**

can start -- he did start communicating.  And so that, to me,
is the biggest piece of evidence to show that this was a
deficit in his education program from when he entered
preschool.

09:09AM      And Ms. Cottier, the specialist, she's a licensed speech
and language path and a specialist in assistive technology, the
full range, from PECS to high tech.  And when she was on the
stand, we asked her how young can these devices be introduced,
and she said that she introduced them as young as three years
09:09AM old.  And so our statute doesn't go back that far, but the
concept that he needed it and it was something that the
district claimed to have highly qualified people looking at
him, it wasn't until the testimony at the trial that they
brought up the fact that he had to show a certain level of
09:09AM progress before they would even test him.  And that's just not
the protocol.  It's just not.  And I think Ms. Cottier provided
testimony to that effect.

      And so I'm focusing on the one issue we won, but it was so
minimized by this ALJ, she -- it was able to find that that was
09:10AM a deficit, but didn't even find the IEPs for that year's
deficit, and there were no goals for AT.  And so it's just
inconsistent.  And the only thing I feel is the best way to
kind of make a global statement about it is she didn't
understand the full complexity of the case.  I think she had
09:10AM plenty of testimony, and her finding Dr. Hughes as uncredible

is astounding.  She's internationally known.  She testified for

seven hours without a hiccup, and she gave her no credibility.

I find that just astounding given her stature in the community

of autism.

09:10AM      She trains people all over the world, and so I don't -- I

think that if she had understood the importance and if she had

listened appropriately and gave some credence to Dr. Hughes, we

wouldn't be here today.  I hope that answers your question.

            THE COURT:  No, you are.  So tell me what assistive

09:11AM  technology or other services or assistance you think the

district should do and the ALJ didn't say was necessary.

            MS. LOYER:  Well, the limited amount of services

from a properly trained speech and language path who would be

overseeing any assistive technology, because it's like an

09:11AM  offspring of speech and language, and I think her remedy was

seven hours and limited to training.  We felt and Ms. Cottier

testified, to some degree, because she had the credentials to

do it, that he needed more.  Especially at his age, we have to

understand that there was a very important developmental window

09:12AM  that was missed when they were trying things and failing and

not moving on up the food chain, so to speak, of communication

intervention.

            And so we think he needs a very enhanced program.  We

think he needs a one-on-one trained aide to be able to

09:12AM  facilitate communication.  It's his voice, and he still is

learning how to use it.  And so it involves at least initially
some level of intensity.  And that wasn't offered and nor was
it given as a remedy.

The other aspect goes to Dr. Hughes and her testimony and
her team's assessment.  One of the things she talked about on
the stand was the concept of verbal behavior.  And that gets --
I'm not an expert, so I'm just going to give you a little bit
of an outline that has to do initially with eye contact and
turning when your name is called.  That's verbal behavior.  But
it crosses into a more complicated concept when you're trying
to facilitate social communication.  And so social
communication is part of what you need in order to be educated
in this system we're in.  And so that type of intervention is
typically behaviorally based, because it's behavior.

And typically the standard of care in the community is
that kids with his diagnosis, that profile, taking into
consideration, of course, his unique needs, they receive a
certain level of intensive ABA, that's applied behavioral
analysis treatment.  He never really got that at an intensive
level.  And when the family brought Dr. Hughes in, it was to
explore that.

Everything in the classroom he was in at the time, even
his one-on-one services that is supposed to mean individual,
him and the therapist, was done in the classroom.  And to me,
that's a violation of the intent of the law.  I mean, how can

1    you say individual takes place in a classroom where other

2    people and other children are there with varying degrees of

3    distractibility?

4        And then you go to E.F.'s unique situation.  We have just

09:14AM 5    cited several cites in his IEP documents.  His parents

6    testified to it.  The service providers testified to it.  He

7    doesn't do well in groups.  Yet none of the services were

8    provided in the one-on-one even though that was on the service

9    plan.  And the ALJ didn't seem to get that either.

09:14AM 10       One of the primary things this child struggles with is

11   that distractibility, keeping his focus.  He had a goal where

12   he could pay attention for eight seconds.  That's a pretty

13   significant deficit.  And so how can he receive appropriate

14   services when all of the services are pushed in and you have

09:15AM 15   all that commotion going on?  It made no sense.

16       I think that that concept is what we asked for in our

17   remedy.  We feel that Dr. Hughes made very good

18   recommendations.  Would that program be given to him in

19   perpetuity?  No.  But he needs that intensity, not only to get

09:15AM 20   him where we think he can go or at least to find out where he

21   can go, but to make up for all the years he didn't get what he

22   needed when he was in the most open developmental window of

23   learning communication and being socialized.

24       I think that we tried to outline it as best we could.  I

09:15AM 25   don't know that the district at this point in time or at that

**UNITED STATES DISTRICT COURT**

1    point in time was equipped because of the change in their

2    programming and the way they handled their whole autism

3    program.  Their adoption of a new format for E.F., that just

4    wasn't working for him, yet he was stuck in it because that's

09:16AM 5    what they had.

6              THE COURT:  Okay.  Well, thank you.

7              MS. LOYER:  Thank you, Your Honor.

8              THE COURT:  I'll hear from Mr. Harbottle and give

9    you a chance to respond to it.

09:16AM 10             MR. HARBOTTLE:  Thank you, Your Honor.

11        As you know from your handling these cases before, this is

12   not a de novo review.  This particular case was particularly

13   long and involved many, many witnesses.  There were seven days

14   of hearing as counsel said.  I think Dr. Hughes was on the

09:16AM 15   stand for seven hours.  Others were on the stand for equivalent

16   lengths of time.

17        And I think that the first thing that needs to be said is

18   that the Court needs to determine whether the decision was

19   thorough and careful.  And if it is thorough and careful, which

09:17AM 20   I believe it is, then significant deference needs to be given

21   to it on the basis that this judge listened to those witnesses.

22        In fact, she was active in questioning witnesses, which is

23   sort of one of the substandards for whether a decision is

24   thorough and careful.  And she was inquisitive.  She wanted to

09:17AM 25   know the answers to these questions.

1    I also think it's important -- one thing that the judge

2  began the case with in her decision -- I'm going to quote this

3  briefly -- she said:

4        "The crux of this case is whether students

09:17AM 5       acknowledge slow progress is due to his

6        disabilities that do not permit him to progress at

7        a more rapid rate or due to failures by the

8        district to adequately access and address all

9        students' unique needs."

09:17AM 10    That's at AR 1273.  That is the basic crux of the

11  situation.  And one thing counsel said at the end of her

12  presentation is right on target, he did have a goal that he

13  needed to maintain attention for seven seconds, eight seconds.

14  There were two, one for seven and then one for eight seconds.

09:18AM 15  That speaks to his level of functioning at the time the IEPs

16  were developed and assessments were done.

17    As a functional matter, an individual who cannot sustain

18  attention for more than eight seconds needs particularly

19  careful services, and the Court -- the judge, the ALJ clearly

09:18AM 20  got the message that this student was operating at his level of

21  functioning throughout the entire period.

22        THE COURT:  Mr. Harbottle, as I get it, though,

23  Ms. Loyer believes that he had serious functional communication

24  problems.  And they had an expert, Dr. Hughes, who says, "Okay.

09:18AM 25  Given where we're at and the problems E.F. has, you need to

```
 1   give these services much greater remedial programs than what

 2   the ALJ found."  What's your response to that?

 3           MR. HARBOTTLE:  I have two immediate responses.  One

 4   is that it came out clearly in the evidence that he was getting

 5   individual speech therapy for about a year and a half, paid for

 6   by the parents, and Mr. Fulsang testified, and it was

 7   corroborated by others, that he terminated that private speech

 8   service -- those private speech services that were given in the

 9   home or in the clinic on the basis that they were not having

10   any effect.  In his words, it didn't pay off.

11       According to the judge, she pointed out that he had tried

12   to downplay that during the course of the hearing.  But, in

13   fact, it was true, that an enhanced level of service, it's not

14   a quantitative measure all the time, it's qualitative.  He

15   employed a private speech provider to ensure that he got as

16   much as the family thought they needed despite the district's

17   offer of less.

18       The second thing I want to point out is the district in

19   the May 8, 2011 IEP doubled the amount of speech services that

20   were being offered in a group setting.  They were offering one

21   times 30 a week.  They doubled it to two times 30 a week.  And

22   the judge also points out that the family, without explanation,

23   never accepted this doubling of speech services.  That would

24   have been functional communication speech and language

25   services.  Never accepted them.  You know, that's a decision
```

that the family made.

　　But the district was operating on the assumption that it was -- not just the assumption, because it did a full-blown triennial assessment between November or December and February 2011 and determined his level of functioning at that point. And we did the IEP, added some goals, deleted some goals, modified the structure of the IEP to address those needs.

　　I also want to point out that there were numerous -- if you read the decision carefully, there were maybe a dozen areas in which the ALJ rightly determines or rightly states that no evidence was presented.  Ms. Loyer started off with her critique of the cognition testing that the district's assessor did.  No one ever critiqued that.  It wasn't part of the evidence.  Dr. Hughes nor Ms. Cottier ever critiqued the district's assessment of students.  Simply saying the cognitive testing is invalid is not evidence nor that the goals weren't appropriate.  There was no evidence on that.

　　In terms of progress, in functional communication and others, all you need to do -- there's nine IEP's in this case. That's unusual.  There's usually -- over the course of a three-year period, there's usually three or four.  There's nine here.  If you go to the trouble to set down each goal and show what happened with it, you'll find that the vast majority were met or there was significant progress on them as they went through.

1        And goals, as you know, are the fundamental piece of an

2   IEP.  Those drive the services.  Those drive the placement for

3   the student.  And in each of the cases, if you go through each

4   of those nine IEPs and the goal progress reports that are also

09:22AM 5   in evidence, you'll see that he was either meeting or making

6   significant progress on his goals.  That evidence was not

7   challenged at the hearing.

8        It's also important to point out the character of the

9   classroom.  Speech language services, the way related services

09:22AM 10   like speech language function in an IEP are to support the

11   placement.  In this case, E.F. had an ABA-based classroom that

12   was language rich, that had sensory integration applications

13   built in, that had visual integration applications built in.

14   It had very few students, very many adults.  I think the ratio

09:22AM 15   was almost one to one or two to one at some point.  That's part

16   of the reason that the services can occur in the classroom,

17   because it's highly structured.

18        The judge said many times that it was a language-rich

19   environment and that was part of the reason that additional

09:23AM 20   individual or group service did not need to be provided.

21   Because as counsel mentioned, Newport Mesa has a highly

22   sophisticated autism-specific program for kids like E.F.  He is

23   on the low end.  He is on the severe end, and they have

24   classrooms and support directly geared to kids that function at

09:23AM 25   his level.

So in terms of the remedy, I think counsel was right, she
focused on the area -- the single area that the judge found we
had been deficient in.  And we didn't appeal that finding.  We
read the decision and found that it was thorough and careful.
And while we disagreed with her perspective on that point,
there was a lot of evidence that was contrary to that.  But
that's not reversible error, just the fact that there's
differences of opinion and differences of perspective.

There was evidence that he was not ready for an iPad or
iTouch in the classroom.  He had to develop functional
communication skills in advance of that.  The judge felt we
were wrong about that and we didn't appeal that because we felt
that overall the decision was thorough and careful.

And I guess the last thing I'll say, unless you have any
more questions for me, is that the Court -- the judge, I think,
took extra pains in this decision to look at what the law
required.  And one of the last things she said in her decision
was the test about -- the test of whether an IEP is appropriate
is whether, taken in its entirety, it is reasonably calculated
to enable a particular child to garner educational benefit.

This record is just chockful of evidence that he was
making meaningful progress on his goals and otherwise.  There's
lots and lots of testimony from his teachers about the progress
he was making in the classrooms, and there's documented
evidence of systematic progress throughout the course of the

```
 1    three years.
 2              THE COURT:  Thank you.
 3              MR. HARBOTTLE:  Thank you.
 4              THE COURT:  Ms. Loyer.
 5              MS. LOYER:  Yes.
 6              THE COURT:  Would you like to respond?
 7              MS. LOYER:  Yes, I would, Your Honor.  Thank you.
 8         Well, obviously we have a difference of opinion.  I think
 9    that I'd like to first address the comments about the dad and
10    the private service provider.  That did come up.  There is
11    testimony, and we did address it in our brief.  The private
12    service provider was working with E.F. on his oral motor
13    skills, and that's all.  And it was she that advised the
14    parents to go to the IEP team to look at assistive technology.
15         And so she -- to use what the dad said, they got what they
16    could out of that.  That wasn't going anywhere further than
17    what it was at the time.  And she was not an AT specialist.
18    And so she said, "That's beyond my scope.  I think he would
19    benefit from it, but you need to talk to the IEP team," and
20    they did.  And the IEP team sat on their hands.  That's the
21    thing that we won, because the testimony clarified what was
22    going on with the private service provider.
23         She didn't testify because we chose not to focus on the
24    individual aspect that she was working on.  We felt --
25    obviously the parents felt that he needed that.  But they made
```

09:27AM

the choice to not go after the district for the oral motor
training.  They went and did that on their own.  And so rather
than complicate what we thought was the core issue, we tried to
streamline our presentation as to what we were looking for and
why.  And it had to do with functional communication and the
misconception that the team had about his cognitive abilities.

And we strongly disagree with counsel's characterization
that nothing was presented.  We presented the documents the
district generated, their assessment reports, where these
numbers were reported and either not commented on or commented
on.  And when he was first tested in 2009, his standard score
was 79.  Now that's below the 80 mark for having deficiencies.
But it said in there all these scores should be viewed with
caution because the entire protocol could not be administered.

The second round of testing that counsel referred to, they
only did one of the subtests, and it's in their record.  So I
don't know how we could challenge evidence that we put in the
record.  It was accepted, and it's explained there.  We
referred to it in our brief.  And they came up with a below 50
and ran with it.  And so we feel it was an assumption that they
easily validated with still faulty testing.

And that's where Dr. Hughes' testimony comes in, that
these kids, when they have that severity of communication
problems and autism, they're very hard to test.  And so you
can't get a definitive number until you approach some level of

functional communication to be able to administer the

protocols.  And the adaptive skills, the alternative testing

they do is also impacted with a child as severe as him.  And so

even alternative testing is viewed with caution.

To say that a child has to have functional communication,

to get access to functional communication, I've never heard

that before in any of the research I've read and in none of the

case law I've read, and the professionals that are tops in the

field out there have never said, "You have to have it to get

it."  So I just don't even understand that theory that they put

out there.

And the quote that counsel gave as to was the program

reasonably calculated for that particular child, I think it

wasn't, and I think we proved it wasn't.  The problem is, is

the evidence presented was not properly analyzed, was not

scrutinized or was not understood.

Yes, the judge was very active, and that can be a real

plus.  I like it when the ALJs get involved with the testimony,

but it also has -- there's another side to that coin.  When you

have a judge that's that active, it seems they might be having

a problem getting their head around it.  And it's not a

personal criticism of the judge, it's the -- this is a

complicated case.  It really is.  As counsel said, there are a

lot of things in issue, and which is why we took the strategy

of trying to focus in on the two things we thought were the

1    problem.

2        I think that the fact that there's so much emphasis put on

3    these goals when -- if you have something missing from a

4    child's IEP, a service, his AT being what's at issue and the

09:30AM  5    individual -- the proper administration of individual services,

6    then I think it follows that there's an absence of goals, and

7    the IEP shows that.  There were no goals directed towards that.

8    And so that is a logical conclusion when you find that there is

9    something missing from the child's program.  And so, yes, we

09:31AM 10    could have put testimony going through nine IEPs and spend

11    another five days in trial, but we felt we proved the most

12    significant thing for this child, and yet it was treated as

13    almost insignificant.

14        How an issue is numbered and placed -- and by the way, the

09:31AM 15    judge decided how that was going to be placed in her prehearing

16    statement -- should not denote the importance of the issue.

17    We're not required to say, "Okay, this is my No. 1 issue and

18    pay attention really to this one."  We lay it all out.  That's

19    our obligation, and that's my ethical obligation for my client

09:32AM 20    is to point out all the legally arguably deficits.

21        And it should -- I should think that given the magnitude

22    of all the experts we had involved in this, that that

23    conclusion that we came to, and even that the judge came to

24    that it was a deficit would have been received differently.  I

09:32AM 25    mean, I have quotes from several educators -- I used some of

them in the documents that I submitted to the Court as to how

important this is, communication.

     And you can have the most enhanced classroom in the

building, but if that child can't access it, it's nothing to

09:32AM 5  that child.  And Dr. Hughes testified to that.  That was one of

my opening remarks on Page 11 of my pleading.  I think that we

just missed the point.  It's like putting a book in front of

him and saying, "Well, sooner or later he'll learn to read."

That isn't how it works.

09:33AM 10     Subsequent to this, I think there's a good shot that he is

going to learn how to read.  Given the kind of program, you see

the kind of progress that he can and will make.  But the book

is -- you know, his story is not told yet.  He's got several

years to make up for all these deficits.  But the progress he's

09:33AM 15  showing is demonstrative, that cracking that nut of

communication is really what needed to be done.

     And it's something that even the district's trainers, that

they testified that Autism Partnership is -- was the people who

trained their people.  And Autism Partnership, it goes against

09:33AM 20  their philosophies as to how these programs are supposed to

run.  And so I don't want to get too in the weeds with this,

but I do think that obviously today we're going to -- we're

trying to strengthen our positions, but I just can't get by the

past -- or past the issue of how important communication is.

09:34AM 25  And I feel like E.F. was kind of sidelined.  They made this

decision, that eight-second goal was good enough, but yet he
could demonstrate much, much longer.  And it's in the record,
attention for preferred items.

For example, he'll work as much as 15, 20 minutes at a
time on puzzles.  Puzzles is one of the things he really
enjoyed.  So I think that information given to these highly
qualified people demonstrated he can maintain attention.

Now preferred items, that's prestandard for any kid.  What
they like to do, they're going to do more.  But it's also
indicative of his capabilities if they can figure out how to
teach through that strength and not use methods that aren't
working.  And that's where we're coming from, is they claim
great progress based on the goals they set and the baselines
they set when they didn't properly look at him.  And so I can
see where they claim met.

But, for example, when a child meets a goal that's only
set at 50 percent, that's as good as chance.  And 60 percent
isn't much better than chance, and Dr. Hughes did address that.
And so I just think that we're not going to get any concessions
from anybody today, but I think that it's a problem that I
think permeates the system, to be honest, Your Honor.

These are tough kids, and they're labor intensive.  But so
many of them -- Autism Partnership boasts that when they do
that intensive intervention for communication, they have a 90
percent success rate.  I was astounded when I heard that.  And

1    I heard it from one of the people that runs the office that the

2    district is contracted with.  And so I just think they gave it

3    their best shot, and they think it was their best shot, but it

4    wasn't.  Not for this child.

09:36AM 5    And I understand the law says that you don't get the best,

6    you just get basic floor of opportunity.  But if you have a

7    child who is -- was eight when the trial happened, who has

8    absolutely no functional communication to be able to educate,

9    couldn't write or spell his own name, I think that maybe we

09:36AM 10   needed to look at a different methodology.

11   He had his own little language his parents worked out with

12   him, and around them he could understand.  And that showed a

13   definite intent to communicate.  And the idea with a child this

14   hard to intervene, we concede he's a difficult case, you have

09:36AM 15   to kind of step out of the box and not put him in that

16   one-size-fits-all program.

17   I think, again, pointing out -- I'm repeating myself, but

18   I really think it's important to understand as you consider

19   this case, is the idea that Dr. Hughes said -- when she said,

09:37AM 20   "You can have the most enhanced environment possible, but if

21   the child can't access it, then it's the wrong environment."

22   Thank you, Your Honor.

23            THE COURT:  Thank you.

24   Would you like a brief rebuttal?  Last word.

09:37AM 25            MR. HARBOTTLE:  Yeah, very brief, Your Honor.  The

child E.F. was accessing this.  This is -- the frustration here
for us is that the evidence says one thing, and the rhetoric
says something else.

    This judge, I've read maybe hundreds of these OAH
decisions, and this is one of the more thorough and careful
I've ever seen.  Plus the evidence, it's just -- it's virtually
indisputable that this student was making progress commensurate
with his abilities.

    I would urge you to look at the number of areas of --
pointed out in the OAH decision where evidence was not
submitted by the student.  And I would urge you to look really
carefully at this open book of documentary evidence that the
student was progressing.  And maybe more importantly or at
least equally importantly, over the course of this three-year
period, this was one of the most proactive IEP teams and one of
the most highly qualified IEP teams that I've seen.

    Their resumes are all on the record.  They were deemed
highly qualified by the ALJ, their testimony was deemed
credible in every respect except for the single one of the ATs,
the delay in the AT.  And this is an excellent record showing
meaningful educational progress.  Not just us telling you now
or telling the ALJ now that he was making progress, this is
documented along the way contemporaneously with the efforts
made by the district.  That's all I have.

            THE COURT:  Thank you.

09:39AM

1    I must say I appreciate the arguments on both sides.  It's

2  very sad to me when you hear about an innocent child having a

3  severe disability.  And I think we all agree that we need to

4  provide the necessary services, care, placement, and education

5  to E.F.  So I recognize the difficulty of this case, and I do,

6  again, appreciate your arguments on both sides.  And I'll try

7  to get a decision out shortly.

8                  MS. LOYER:  Thank you, Your Honor.

9                  MR. HARBOTTLE:  Thank you, Your Honor.

09:40AM 10                  THE COURTROOM DEPUTY:  All rise.

11             **(Proceedings concluded at 9:39 a.m.)**

12                      **--oOo--**

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  October 13, 2015*

16

17

18

19                            */S/ DEBBIE HINO-SPAAN_*

20                            *Debbie Hino-Spaan, CSR No. 7953*
                              *Federal Official Court Reporter*
21

22

23

24

25